UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY SMITH, | **1:17-cv-00436-DAD-GSA-PC** |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED (ECF No. 87.)** |
| v. | |
| SERGEANT J. GONZALES, et al., | |
| Defendants. | **FOURTEEN-DAY DEADLINE TO FILE OBJECTIONS** |

## I.      PROCEDURAL HISTORY

Larry Smith ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.  This case now proceeds with Plaintiff's First Amended Complaint filed on June 23, 2017, against defendants Sergeant Gonzales, Correctional Officer (C/O) Johnson, C/O Castro, C/O Meier,[1] C/O Flores,[2] and C/O Potzernitz for use of excessive force in violation of the Eighth Amendment; against defendant C/O Scaife

---

[1] Sued as Miner.

[2] Sued as Florez.

1

for failure to protect Plaintiff in violation of the Eighth Amendment; and against defendant Sergeant Gonzales for retaliation in violation of the First Amendment.[3] (ECF No. 12.)

On December 21, 2020, defendants Gonzales, Johnson, Castro, Meier, Flores, Potzernitz, and Scaife ("Defendants") filed a motion for summary judgment based on the undisputed facts presented, on the grounds that: (1) Defendants did not violate Plaintiff's constitutional rights; (2) Plaintiff has no evidence to establish necessary elements of his claims; and (3) Defendants are entitled to qualified immunity. (ECF No. 87.)

On January 15, 2021, Plaintiff filed a motion, (ECF No. 88), for a 60-day extension of time to file his opposition to the motion for summary judgment, which the court granted on February 3, 2021, (ECF No. 88). On April 1, 2021, Plaintiff filed an opposition to the motion for summary judgment.[4] (ECF Nos. 90, 91.) On April 8, 2021, Defendants filed a reply to Plaintiff's opposition. (ECF No. 92.) In their reply, Defendants addressed Plaintiff's Declaration in which Plaintiff suggested that he may require an extension of time to file all of the opposition to the motion for summary judgment which he intended to submit. (Id.) Defendants responded that they would not oppose one further extension of time for Plaintiff. (Id.)

On April 23, 2021, Plaintiff filed a second opposition to the motion for summary judgment. (ECF No. 93.) On April 26, 2021, the court issued an order striking Plaintiff's second opposition as an impermissible surreply. (ECF No. 94.) However, in light of Defendants' indication that they would not oppose one further extension of time for Plaintiff to file all of his opposition, on April 30, 2021, the court found good cause to reinstate Plaintiff's second opposition allowing Defendants thirty days in which to reply to the second opposition. (ECF No.

---

[3] On February 19, 2020, the court granted summary judgment in favor of defendant C/O A. Fritz based on plaintiff's failure to exhaust administrative remedies for the claims against defendant Fritz. (ECF No. 57.) The court also granted summary judgment to Sgt. J. Gonzales as to plaintiff's retaliation claims to the extent they are based on defendant Gonzales's alleged issuance of a RVR recommending that plaintiff be transferred; the court denied summary judgment as to plaintiff's remaining retaliation claim against defendant Sgt. J. Gonzales. (Id.)

[4] Together with the motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion for summary judgment. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998). (ECF No. 87-1.)

95.)   On  May  28,  2021,  Defendants  filed  a  reply  to  Plaintiff's  second  opposition.    (ECF No. 96.)

Defendants' motion for summary judgment has now been submitted upon the record without oral argument pursuant to Local Rule 230(l), and for the reasons that follow the court shall recommend that Defendants' motion for summary judgment be denied.

## II.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).   Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).   The court may consider other materials in the record not cited to by the parties, but it is not required to do so.   Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he only needs to prove an absence of evidence to support Plaintiff's case.   In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).   If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."   Id.   This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."   Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.   PLAINTIFF'S ALLEGATIONS IN THE FIRST AMENDED COMPLAINT[5]

At the time of the events at issue in this case, Plaintiff was incarcerated at Corcoran State Prison (CSP) in Corcoran, California.

Plaintiff's allegations follow:

On September 12, 2013, Plaintiff arrived at CSP. Plaintiff was diagnosed with a urinary infection which caused him severe pain.  He was prescribed Tylenol with Codeine and antibiotics. On September 23, 2013, while defendant C/O Johnson was escorting Plaintiff to get his pain medications, Plaintiff doubled up in pain. Defendant Johnson asked, "Hey old timer are you alright," and Plaintiff told him about the infection that was causing him severe pain. (ECF No. 12 at 12:13-14.)[6]

///

---

[5] Plaintiff's First Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claims in this section should not be viewed by the parties as a ruling that the allegations are admissible. The Court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections that follow.

[6] All page numbers cited herein are those assigned by the court's CM/ECF system and not based on the parties' pagination of their briefing materials.

On September 24, 2013, at 7:00 a.m., defendant C/O Johnson and C/O Fritz (female) [not a defendant] came to conduct a random search of Plaintiff's cell. C/O Johnson instructed C/O Gonzales (control booth officer – not a defendant) to open Plaintiff's cell. Plaintiff's cell mate was sitting on the top bunk. Defendant Johnson opened the cell door and instructed Plaintiff to remove all of his clothing, turn around, bend forward at the waist and pull his buttocks apart and hold them open so that defendant Johnson could examine Plaintiff's rectal area. Other inmates were being released for breakfast and witnessed this strip search in the presence of the female C/O. Per CDCR policy, Plaintiff squatted and coughed. Johnson stated that if Plaintiff didn't allow him to "look up my butt," he would have Plaintiff placed on potty watch. (ECF No. 12 at 5.) Plaintiff requested potty watch. Defendant Johnson gave Plaintiff his boxer shorts and as soon as Plaintiff put them on defendant Johnson grabbed Plaintiff by the arm and the back of his head, slammed his face into the wall busting Plaintiff's mouth, and then handcuffed him. C/O Gonzales [not a defendant] also witnessed the incident by C/O Johnson. When C/O Johnson slammed Plaintiff's face into the wall, C/O Gonzales stuck his gun out of the control booth and pointed it at Plaintiff. Defendant Johnson told C/O Fritz to watch Plaintiff's cell mate and to spray him if he moved. C/O Johnson locked Plaintiff in the shower and went back to search Plaintiff's cell. C/O Johnson returned to the shower and asked if Plaintiff was going to follow his instructions. Plaintiff just looked at him. C/O Johnson instructed C/O Gonzales [not a defendant] to open the shower door and told Plaintiff to exit. As Plaintiff came out, C/O Johnson grabbed him by the hand, still handcuffed, bent his wrist very aggressively, escorted Plaintiff to the program office and placed him into a holding cage.

A short time later, defendants Sgt. Gonzales, C/O Johnson, C/O Castro, C/O Miner, C/O Flores, C/O Potzernitz, and C/O Scaife came into the holding area. C/O Scaife stood by the door and observed. Sgt. Gonzales stated that C/O Johnson believed Plaintiff had contraband secreted in his rectal cavity. Plaintiff informed Sgt. Gonzales about his urinary infection that was causing him severe pain and told Sgt. Gonzales that he could verify this information at the clinic. Sgt. Gonzales said that wasn't necessary, he just needed to check Plaintiff for contraband. Sgt. Gonzales instructed Plaintiff to remove his boxers, raise his hands up, open his mouth, and run

his fingers through his hair, which Plaintiff did. Sgt. Gonzales then unlocked the holding cage and instructed him to exit, which Plaintiff did. Sgt. Gonzales told Plaintiff to turn his back to him, bend forward at the waist and grab his buttocks and spread them open so he could "see up my butt." (ECF No. 12 at 6:15.) Plaintiff told Sgt. Gonzales that CDCR policy was to squat and cough. Plaintiff squatted and coughed five times. Sgt. Gonzales told Plaintiff he needed to follow his instructions or he would place Plaintiff on potty watch. Plaintiff said he would rather be on potty watch than hold his butt open for a bunch of homosexual correctional officers. Sgt. Gonzales then stated, "I'm not going to waste everybody's time placing you on potty watch," then grabbed Plaintiff and instructed the other C/Os to take Plaintiff down. (ECF No. 12 at 6:19-20.) Defendants Johnson, Castro, Miner, Flores, and Potzernitz all attacked Plaintiff, forcing him to the ground naked. Plaintiff was kicked and stomped in the head, shoulders, back, and legs. C/O Castro and C/O Potzernitz stood on Plaintiff's upper back pinning him to the ground. C/O Miner and C/O Flores grabbed Plaintiff's ankles and forced his legs apart. Defendant C/O Scaife stood by and watched the assault. Then C/O Johnson got on the ground, grabbed Plaintiff's buttocks, and spread them apart. Sgt. Gonzales stood between Plaintiff's legs and instructed C/O Miner and C/O Flores to lift his legs up. Sgt. Gonzales then checked Plaintiff's rectal area. Plaintiff was cleared and the officers let him go. Sgt. Gonzales instructed Plaintiff to go back into the holding cage and returned his boxer shorts to him. All of the officers stepped out into the hallway. Plaintiff was humiliated and embarrassed.

A short time later, Plaintiff overheard C/O Johnson and Sgt. Gonzales conspiring in the hallway. C/O Johnson said, "Inmate Smith has a history of filing staff misconduct complaints." (ECF No. 12 at 7:4-5.) Sgt. Gonzales responded, "Let him go back to his cell and if he says anything we'll say he got into a fight with his cell mate." (ECF No. 12 at 7:6-7.)

Sgt. Gonzales returned to the holding cage and instructed Plaintiff to return to his cell. Plaintiff informed Sgt. Gonzales that he needed medical attention and was in great pain from being kicked and stomped. Sgt. Gonzales told Plaintiff to return to his cell and he would notify medical staff. At this point, Sgt. Gonzales picked up a towel and started to wipe the boot prints off of Plaintiff's back. Plaintiff told him not to touch him and started walking out of the program

office. Plaintiff turned left towards medical instead of right toward 3A05 (his cell). Sgt. Gonzales came running out of the program office, stopped Plaintiff and told him to return to his cell. Plaintiff sat on the ground and told Sgt. Gonzales he was in pain and needed medical attention. Sgt. Gonzales instructed C/O Castro and C/O Potzernitz to pick Plaintiff up and return him to his cell. Castro and Potzernitz each grabbed Plaintiff under his arm and started to half carry and half drag him across the yard. Plaintiff started yelling, the yard tower activated an alarm and Sgt. Gonzales instructed the officers to put him down. Nurse Levan [not a defendant] arrived and asked what the matter was. Plaintiff told the nurse that Sgt. Gonzales and six C/Os had assaulted him. Sgt. Gonzales told the nurse that they didn't assault Plaintiff, and Plaintiff's back was dirty because he had lain on the ground. The nurse asked Sgt. Gonzales how Plaintiff's mouth got busted and his shoulder got bruised. Sgt. Gonzales told the nurse to medically clear Plaintiff so they could put him back in his cell. The nurse told Sgt. Gonzales to use a wheelchair to return him to his cell and she would have Plaintiff seen by the doctor later.

Nurse Levan filled out a CDCR-7219 medical report of Plaintiff's injuries noting redness and dried blood on his mouth and abrasions on his shoulders, back, and legs.

C/O Johnson confiscated Plaintiff's 602 form from his pocket at the clinic window at noon when Plaintiff informed Nurse Levan that he was suicidal. Sgt. Gonzales then read the 602 out loud to other C/Os at the program office while Plaintiff was waiting to see his clinician Dr. Stokes [not a defendant].

Sgt. Gonzales issued Plaintiff RVR (Rules Violation Report) #3-A-13-09-034 for willfully delaying a peace officer as a way to justify his actions, using creative writing to say he ordered C/Os Castro and Potzernitz to pick Plaintiff up and return him to his cell because when Plaintiff sat down and requested medical attention, he was blocking the doorway to the program office which was a hazard. Sgt. Gonzales also said that the 7219 medical report by Nurse Levan only listed a busted lip. Initially, the RVR was written by C/O Johnson. But Sgt. Gonzales altered it from saying Plaintiff squatted and coughed to say that Plaintiff had not followed his instructions to bend forward at the waist and spread his buttocks. He said that after five minutes of speaking to Plaintiff, Plaintiff complied and the search was concluded with negative results. But the five-

minute conversation actually consisted of Sgt. Gonzales ordering his staff to use force on Plaintiff, pinning him down, kicking and stomping him, and forcibly spreading his buttocks apart. There were also other errors written on the RVR, which is why Plaintiff requested as witnesses C/O Gonzales, C/O Fritz, and Plaintiff's cell mate. (ECF No. 12 at 9 ¶3.)

At the RVR hearing, Nurse Levan told Hearing Officer Lt. Marmolejo [not a defendant] that Sgt. Gonzales told her (nurse) to turn the report over to Sgt. Gonzales, who claimed he misplaced it and never found it. However, Lt. Marmolejo did not record this statement at the RVR hearing. Plaintiff had two other medical reports done by Dr. Barnett [not a defendant] on September 25, 2013, and Nurse Grisweld [not a defendant] on September 24, 2013, to document Plaintiff's injuries showing the injuries Plaintiff received from the assault on September 24, 2013. At the hearing, Plaintiff was not allowed to question Nurse Levan. Hearing Officer Lt. Marmolejo asked Sgt. Gonzales if Plaintiff informed him of his medical condition and that he needed to see the nurse. Sgt. Gonzales answered that he didn't remember, but he contradicted himself by saying Plaintiff sat on his butt claiming he needed medical. Lt. Marmolejo did not allow Plaintiff's requested witnesses. Also, Plaintiff should have been assigned an Investigative Employee but was not. Plaintiff was found guilty of a rules violation and forfeited 90 days of credits and lost 90 days of privileges. Also, as a result of the disciplinary proceeding Plaintiff's privilege group was changed from A-1 to B-2 status.

At noon, Sgt. Gonzales instructed C/O Johnson to roll up Plaintiff's property and bring it up to the program office because if Plaintiff was going to file a 602 grievance for staff misconduct and use of force, then Sgt. Gonzales would have Plaintiff placed in Administrative Segregation (Ad-Seg) for three to six months without his property. Plaintiff was then placed in a mental health crisis bed on suicide watch for a few days. When he returned to 3A yard all of his property was missing. On October 16, 2013, some of Plaintiff's property was returned by C/O Flores.

On October 16, 2013, Plaintiff filed a 602 grievance, #CSP-C-2-13-07568, concerning the use of excessive force and not reporting it, which was partially granted on December 31, 2013. Plaintiff submitted it to the third level on January 15, 2014, where it was rejected on February 25, 2014. Plaintiff re-submitted it on April 10, 2014, and it was rejected again on July

28, 2014. Plaintiff submitted it again on August 4, 2014, and it was rejected a third time on October 15, 2014. Plaintiff wrote a letter to Attorney General Kamala Harris on January 11, 2015, and a letter to the Inspector General on February 22, 2015.

On November 11, 2013, Plaintiff was placed on suicide watch again. During this time, Plaintiff's property was rolled up and never issued back to him. When Plaintiff returned back to 3A yard on November 12, 2013, he refused to be housed with a gang member. Custody attempted to move Plaintiff into a cell which was already occupied by an inmate in the lower bunk who was a gang member. Custody had written on Plaintiff's bed card that he was a Crip gang member, which is not true. The inmate had already made plans to move a friend in with him, so Plaintiff refused to move in because Plaintiff is not a gang member and because Plaintiff also had a lower bunk chrono. This upset Sgt. Gonzales because Plaintiff had three cell moves in one month.

Plaintiff informed floor staff that he was suicidal and wanted to return to the mental health crisis bed, so he was taken to the program office and placed into a holding cage. Sgt. Gonzales stated that he was tired of Plaintiff "going suicidal," so he was going to move Plaintiff off 3A yard. (ECF No. 12 at 15:12.) Sgt. Gonzales told Plaintiff's clinician, Dr. Stokes, that he was placing Plaintiff in Ad-Seg for safety concerns because Plaintiff had told him (Gonzales) that Plaintiff was being beaten up by the black inmates for no reason. Sgt. Gonzales issued Plaintiff a fictitious lock-up order for safety concerns and had him placed in Ad-Seg. Plaintiff alleges that he never told Sgt. Gonzales he was being beaten up and that Sgt. Gonzales made up a fictitious story to suit his purpose for the lock up order and RVR.

Plaintiff's clinician Dr. Stokes told Plaintiff that Sgt. Gonzales said he was having Plaintiff placed in Ad-Seg for safety concerns, but she (Stokes) was sending him to the mental health crisis bed. When Plaintiff returned on November 15, 2013, he was placed in Ad-Seg.

On November 13, 2013, Sgt. Gonzales issued a chrono for safety concerns which said that housing unit staff informed Plaintiff that he would be housed with a compatible cell mate. Sgt. Gonzales doesn't identify the cell mate or the housing unit staff who said that Plaintiff stated, "I'm not going to get beat up again. The last cell mate I was with beat me up so I said I'd kill him if I stayed in the cell with him." (ECF No. 12 at 15:24-25.) Plaintiff alleges that none of this

is true. Plaintiff did not tell Sgt. Gonzales that he had been assaulted multiple times on Facility 3A by a black inmate. Plaintiff alleges that he would have filed a 602 appeal if he had been assaulted. Sgt. Gonzales never interviewed Plaintiff about safety concerns. The document stating Plaintiff was claiming safety concerns endangered Plaintiff's life on the general population. Plaintiff never said that inmates Johnson or Law were on his enemy list. Plaintiff contends that Sgt. Gonzales issued the safety concerns order to get back at Plaintiff for filing the 602 use of force appeal. Sgt. Gonzales labeled him as a "snitch" and pressured Plaintiff into being placed on a sensitive needs yard, both which placed Plaintiff in danger when released back to the yard or transferred to another prison. (ECF No. 12 at 17:19.)

Under CDCR 3315, other employees cannot issue write-ups on other staff's behavior. The staff who witnessed the infraction must write the RVR. Plaintiff contends that therefore 3A02 housing staff, and not Sgt. Gonzales, should have issued him an RVR for refusing a cell mate.

Plaintiff submitted a 602 appeal concerning his missing property and it was assigned to Sgt. Gonzales at the first level of review. On January 15, 2014, Sgt. Gonzales denied the appeal, stating that Plaintiff never had any property while he was at CSP. This was not true. Plaintiff had four boxes of property when he arrived at CSP. The 602 was denied at the second and third levels of review.

On November 23, 2013, Plaintiff was scheduled for transfer to Lancaster State Prison due to Sgt. Gonzales' safety concerns. On January 5, 2014, Plaintiff filed a 602 appeal concerning his transfer and another appeal concerning Sgt. Gonzales falsifying state documents. On March 3, 2014, Plaintiff was transferred to Pelican Bay Supermax State Prison for no reason where all of his chronos were cancelled.

Plaintiff alleges he was retaliated against by Sgt. Gonzales for exercising his right to file a grievance against Sgt. Gonzales and his staff for using excessive force against Plaintiff during a random cell search, and the retaliatory actions did not advance any legitimate penological goals. Plaintiff alleges that all of the following actions were retaliatory: issuing the RVR and lock up

///

order and placing Plaintiff in Ad-Seg on November 12, 2013; recommending that Plaintiff be transferred; and, confiscating Plaintiff's personal property on November 12, 2013.

## IV.   PLAINTIFF'S CLAIMS – LEGAL STANDARDS

On May 22, 2018, the court screened the First Amended Complaint, filed on June 23, 2017, and found that Plaintiff states cognizable claims against defendants Sergeant Gonzales, C/O Johnson, C/O Castro, C/O Meier, C/O Flores, and C/O Potzernitz for use of excessive force in violation of the Eighth Amendment; against defendant C/O Scaife for failure to protect Plaintiff in violation of the Eighth Amendment; and against defendant Sergeant Gonzales for retaliation in violation of the First Amendment.  (ECF No. 22.)

### A.   <u>Excessive Force – Eighth Amendment Claim</u>

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ."  <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992).  "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency."  <u>Id.</u> (internal quotation marks and citations omitted).  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident.  <u>Id.</u> at 9; <u>see also</u> <u>Oliver v. Keller</u>, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines *de minimis* uses of force, not *de minimis* injuries)).  However, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  <u>Id.</u> at 9.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind."  <u>Id.</u> at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  <u>Id.</u> at 7.  "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that

need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  Id. (internal quotation marks and citations omitted).  "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it."  Id.

**B.     Failure to Protect – Eighth Amendment Claim**

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006).  Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (internal citations and quotations omitted).  Prison officials have a duty to take reasonable steps to protect inmates from physical abuse.  Farmer, 511 U.S. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005).  The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation where prison officials know of and disregard a substantial risk of serious harm to the plaintiff.  E.g., Farmer, 511 U.S. at 847; Hearns, 413 F.3d at 1040.

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent to a serious threat to the inmate's safety."  Farmer, 511 U.S. at 834.  The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently "substantial risk of serious harm" to his future health. Id. at 843 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)).  The Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result."  Farmer, 511 U.S. at 835.  The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware."  Id. at 836-37.

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious."   Id. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate

health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. Farmer, 511 U.S. at 842; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

**C.     Retaliation – First Amendment Claim**

As discussed by the Ninth Circuit in Watison v. Carter:

"A retaliation claim has five elements. Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).  First, the plaintiff must allege that the retaliated-against conduct is protected. The filing of an inmate grievance is protected conduct. Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).

Second, the plaintiff must claim the defendant took adverse action against the plaintiff.  Id. at 567.   The adverse action need not be an independent constitutional violation.  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995). "[T]he mere *threat* of harm can be an adverse action...." Brodheim, 584 F.3d at 1270.

Third, the plaintiff must allege a causal connection between the adverse action and the protected conduct.  Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal.  See Pratt, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent"); Murphy v. Lane, 833 F.2d 106, 108–09 (7th Cir. 1987).

Fourth, the plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Robinson, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm," Brodheim, 584 F.3d at 1269, that is "more than minimal," Robinson, 408 F.3d at 568 n.11.  That the retaliatory conduct did not

///

chill the plaintiff from suing the alleged retaliator does not defeat the retaliation claim at the motion to dismiss stage. Id. at 569.

Fifth, the plaintiff must allege "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution. . . ." Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.1985). A plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious, id., or that they were "unnecessary to the maintenance of order in the institution," Franklin v. Murphy, 745 F.2d 1221, 1230 (9th Cir.1984)."

Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012).

## V.   DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 260(a), Defendants Gonzales, Meier, Johnson, Castro, Flores, Potzernitz, and Scaife submitted this statement of undisputed facts with citations to the supporting evidence. (ECF No. 87-3.) Defendants identify these facts as undisputed solely for purposes of this Motion for Summary Judgment. In the event that Defendants' Motion for Summary Judgment is denied, in whole or in part, Defendants reserve the right to contest all material facts at trial.

Defendants' evidence includes Plaintiff's allegations in the verified First Amended Complaint (ECF No. 12); declarations of defendant Sergeant J. Gonzales (ECF No. 87-4), of Appeals Coordinator S. Boxall (ECF No. 87-5), of Appeals Coordinator M. Harder (ECF No. 87-6), of Appeals Coordinator P. Williams (ECF No. 87-7), of Appeals Coordinator M. Russell (ECF No. 87-8), of Deputy Attorney General James Mathison (ECF No. 87-9), of defendant B. Johnson (87-10), of defendant E. Castro (ECF No. 87-11), of defendant J. Potzernitz (ECF No. 87-12), of defendant G. Meier (ECF No. 87-13), of defendant A. Scaife (ECF No. 87-14), of defendant H. Flores (ECF No. 87-15); and prison records.

Plaintiff's complete responses to Defendants' undisputed facts are found in Plaintiff's opposition to the motion for summary judgment. (ECF No. 90.)

///

**UNDISPUTED FACTS**

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 1. At approximately 7:15 a.m. on September 24, 2013, Defendants Johnson and Scaife conducted a search for contraband of Plaintiff Smith's cell. As part of the search, Johnson attempted to conduct an unclothed body search of Smith, and in doing so instructed Smith to bend at the waist and spread his buttocks, so that Johnson could visually confirm that Smith did not have contraband hidden in his rectum. | (Decl. Johnson, ¶ 2; Decl. Scaife, ¶ 2.) | UNDISPUTED<br><br>Plaintiff adds some of his own facts but does not contradict or dispute Fact #1 as set forth by Defendants. (ECF No. 90 at 1.)<br><br>Therefore, Defendants' Fact #1 is undisputed. |
| 2. Smith refused to comply with Johnson's instructions. Because he would not comply, Johnson handcuffed Smith, escorted him to the facility Program Office, and placed him in a holding cell there. | (Decl. Johnson, ¶ 2.) | UNDISPUTED |
| 3. During these events Johnson used no physical force on Smith, other than to handcuff him. | (Decl. Johnson, ¶ 3.) | DISPUTED<br><br>Plaintiff states that as soon as C/O Johnson returned Plaintiff's boxer shorts, he grabbed Plaintiff by the arm and back of his head, slammed Plaintiff's face into the wall busting his mouth open, which was bleeding. (ECF No. 90 at 2 ¶ 3.)<br><br>Plaintiff's version raises a genuine dispute of material fact. |

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 4.      During these events Scaife used no physical force on Smith. | (Decl. Scaife, ¶ 2.) | UNDISPUTED<br><br>Plaintiff adds some of his own facts but does not contradict or dispute Fact #4 as set forth by Defendants. (ECF No. 90 at 2 ¶ 4.)<br><br>Therefore, Defendants' Fact #4 is undisputed. |
| 5.      At approximately 7:45 a.m., Johnson notified Defendant Sergeant Gonzales that Smith had refused to comply with his orders to submit to an unclothed body search, and that Smith had been placed in the holding cell. Gonzales entered the holding cell area and spoke to Smith about the situation, and of the need to complete the search to ensure that Smith was not in possession of contraband. | (Decl. Johnson, ¶ 2; Decl. Gonzales, ¶ 2.) | UNDISPUTED |
| 6.      Gonzales instructed Smith to remove his boxer shorts, and conducted a visual search of Smith's mouth, ears, hands, fingers, underarms and feet. Gonzales then instructed Smith to step out of the holding cell in order to visually inspect his rectal cavity, and directed Smith to bend forward at the waist and spread his buttocks for visual inspection. Smith refused to comply with this instruction, and instead he squatted and coughed. Gonzales again instructed Smith to bend forward at the waist and spread his buttocks, and again Smith squatted and coughed. | (Decl. Gonzales, ¶ 2.) | UNDISPUTED<br><br>Plaintiff adds some of his own facts but does not contradict or dispute Fact #6 as set forth by Defendants. (ECF No. 90 at 2 ¶ 6.)<br><br>Therefore, Defendants' Fact #6 is undisputed. |

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 7.     During these events, Gonzales did not use physical force on Smith. | (Decl. Gonzales, ¶ 2.) | DISPUTED<br><br>Plaintiff states that Sgt. Gonzales gave the order for his staff to take Plaintiff down and participated in physically assaulting him on 9-24-13 in the program office holding tank area. (ECF No. 90 at 4-5 ¶ 7.)<br><br>Plaintiff's version raises a genuine dispute of material fact. |
| 8.     Gonzales instructed Smith to return to his cell. While exiting, Smith stated that he wanted to see the nurse because his back hurt. Gonzales again instructed Smith to return to his cell, and told him that his staff would notify medical staff of Smith's request. | (Decl. Gonzales, ¶ 2.) | UNDISPUTED<br><br>Plaintiff adds some of his own facts but does not contradict or dispute Fact #8 as set forth by Defendants. (ECF No. 90 at 2 ¶ 8.)<br><br>Therefore, Defendants' Fact #8 is undisputed. |
| 9.     Smith sat down and then lay down in front of the Program Office door. A Licensed Vocational Nurse arrived, examined Smith, and he was medically cleared to return to his cell. | (Decl. Gonzales, ¶ 2.) | DISPUTED but not material<br><br>Plaintiff states that he did not sit down in front of the program office door. It was between the program office and the clinic.<br><br>While Plaintiff has disputed Fact #9, his version does not raise a genuine dispute of material fact. |

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 10.     Defendant Potzernitz escorted Smith back to his cell, and Potzernitz did not use any physical force on Smith. | (Decl. Potzernitz, ¶ 2, 3.) | DISPUTED<br><br>Plaintiff states that defendant Potzernitz did use force on Plaintiff, which resulted in injuries.     C/O Potzernitz stood on Plaintiff's back and kicked, punched, and stomped him in the program office.  (ECF No. 90 at 4-5 ¶ 10.)<br><br>Plaintiff's version raises a genuine dispute of material fact. |
| 11.     Defendants Johnson, Castro, Flores and Meier were in the Program Office building at the time Gonzales searched Smith. None of these Defendants were involved in the events, and they did not use any physical force on Smith. Defendant Scaife was not present. | (Decl. Johnson, ¶ 2; Decl. Castro, ¶ 2, 3; Decl. Meier, ¶ 2; Decl. Flores, ¶ 2; Decl. Scaife, ¶ 3.) | DISPUTED<br><br>Plaintiff states that C/O Johnson, Castro, Flores, Meier, and Potzernitz all assisted Sgt. Gonzales in taking Plaintiff down by kicking, stomping and punching all over his body. C/O Scaife was present. (ECF No. 90 at 5 ¶ 11.)<br><br>Plaintiff's version raises a genuine dispute of material fact. |
| 12.     Smith was examined at the prison medical clinic at 2:30 p.m. on September 24, 2013, when he complained that he was hearing voices telling him to kill his cellmate. He did not report any physical injuries, and none were found. | (Decl. Mathison, ¶ 3 and Ex. B.) | DISPUTED, not material<br><br>Plaintiff states that he was not examined at the prison clinic at 2:30pm on September 24, 2013, by any medical staff. No injury was reported at 2:30pm on September 24, 2013 because at that time Plaintiff was suicidal. But he <u>was</u> examined on September 25, 2013.<br><br>While Plaintiff has disputed Fact #12, his version does not raise a genuine dispute of material fact. |

18

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 13.    Smith was examined at the prison medical clinic on September 25, 2013, when he reported feeling suicidal. He was found to have superficial abrasions on his shoulders and left knee area. | (Decl. Mathison, ¶ 3 and Ex. B.) | DISPUTED<br><br>Plaintiff adds more facts but does not contradict or dispute Fact #13 as set forth by Defendants. (ECF No. 90 at 5 ¶ 13.) Therefore, Defendants' Fact #13 is undisputed. |
| 14.    On November 13, 2013, Defendant Gonzales wrote a Form 128B General Chrono titled "Safety Concerns/Closure Report," which stated that Smith had reported to Gonzales having safety concerns in housing with Black inmates. | (Decl. Gonzales, ¶ 3 and Ex. B.) | UNDISPUTED<br><br>Plaintiff adds more facts but does not contradict or dispute Fact #14 as set forth by Defendants. (ECF No. 90 at 5-6 ¶ 14.)<br><br>Therefore, Defendants' Fact #14 is undisputed. |
| 15.    Gonzales prepared the Form 128B in response to safety and security concerns for Smith, other inmates and prison staff. | (Decl. Gonzales, ¶ 3 and Ex. B.) | DISPUTED<br><br>Plaintiff states that he did not have any conversation with Sgt. Gonzales about safety concerns.   The 128B form was written by Gonzales as a ploy that Gonzales used to intimidate inmates who reported his wrongdoing. Plaintiff did not have safety concerns about inmates.  His safety concerns were about officers, and he filed 602's against officers who did him wrong.<br><br>Plaintiff's version raises a genuine dispute of material fact. |

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 16.     Smith was placed and retained in the Administrative Segregation housing unit by other prison officials (other than Gonzales) based on all of his case factors including the Form 128B, his involvement in an in-cell fight on November 8, 2013, his history of attempting to become single celled, and his having documented enemies in the prison's general population. | (Decl. Mathison, ¶ 2 and Ex. A at pages 002-003.) | DISPUTED<br><br>Plaintiff states that he was placed and retained in administrative segregation based solely on documentation issued by Sgt. Gonzales who wrote the CDCR 14-D lock-up stating that Plaintiff informed him that Black inmates were beating him up for no reason. The in-cell fight happened on Sgt. Gonzales's off day, and inmate Johnson and plaintiff signed a chrono saying they could program on the same yard together. Sgt. Gonzales wrote documentation stating that inmate Johnson and Lewis were Plaintiff's enemies, but they were not. Plaintiff had just transferred to Corcoran.<br><br>Plaintiff's version raises a genuine dispute of material fact. |
| 17.     Since Gonzales prepared the Form 128B, Smith has filed 101 inmate grievances, including twenty grievances against prison staff. | (Decl. Boxall, ¶ 5, 6 and Ex. A; Decl. Williams, ¶ 5, 6 and Ex. A; Decl. Russell, ¶ 5, 6 and Ex. A; Decl. Harder, ¶ 3-10 and Exs. A-G.) | UNDISPUTED |

| FACT | CITATION TO EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|---|
| 18.    Defendants Gonzales, Johnson, Castro, Potzernitz, Flores, Meier and Scaife have never acted with a purpose or intent to harm Smith. They have never knowingly disregarded a substantial risk to Smith's safety. | (Decl. Gonzales, ¶ 4; Decl. Johnson, ¶ 4; Decl. Castro, ¶ 4; Decl. Potzernitz, ¶ 4; Decl. Flores, ¶ 3; Decl. Meier, ¶ 3; Decl. Scaife, ¶ 4.) | DISPUTED<br><br>Plaintiff states that he told Johnson that he was suffering from a painful urinary infection.   The next day, September 24, 2013, C/O Johnson and his partner came to Plaintiff's cell for a routine cell search, no reasonable suspicion.   For over five minutes, Plaintiff was naked and the 7 of them were trying to get Plaintiff to bend over and spread his buttocks, while Plaintiff kept telling them he had a urinary infection.   Sgt. Gonzales threatened to place Plaintiff on potty watch. They could have had Plaintiff x-rayed, but they chose to use force.     Then they tried to cover up the use of force. They would make cat calls whenever Plaintiff walked to chow.     They tried to intimidate Plaintiff so he would not report what they had done.  C/O Johnson took the first 602 and gave it to Sgt. Gonzales who read it out loud while the other C/Os laughed at it.  They tried to blackmail Plaintiff with the 128-B safety chrono.<br><br>Plaintiff's version raises a genuine dispute of material fact. |

## VI.    DEFENDANTS' ARGUMENTS

### A.    There Was No Unconstitutional Retaliation By Defendant Gonzales

#### 1.    *Plaintiff Cannot Show That Defendant's Action Was Retaliatory*

Defendants argue that Plaintiff's allegation that defendant Gonzales's action in preparing the Form 128B about safety concerns was retaliatory is merely speculation, which does not create a material dispute of fact.   Defendants assert that the undisputed facts show that defendant

Gonzales prepared the Form 128B only in response to safety and security concerns for Plaintiff, other inmates and prison staff.

Defendant Gonzales declares:

> "I did not prepare this document (Exhibit B) in retaliation for Smith having submitted, or stating that he intended to submit, staff complaints against myself or other prison staff, [and] I did not prepare this document (Exhibit B) for any retaliatory purpose."

(Gonzales Decl., ECF No. 87-4 at 2 ¶ 3.)

As evidence, Defendant Gonzales submits a copy of the Form 128B General Chrono he prepared and signed concerning Plaintiff, which states in part:

> On Tuesday, November 12, 2013, inmate Smith was removed from Facility III-A General Population and placed into Administrative Segregation (*Ad-Seg*) as a result of his self-admitted Safety Concerns. . . Inmate Smith was informed that he would be housed with a compatible cellmate. Inmate Smith stated, "I'm not going into the cell with anyone [and] I'm not going to get beat up again. The last cellmate I was with beat me up so I said I'd kill him if I stayed in the cell with him.". . . I asked inmate Smith if he fears for his safety on the facility. Inmate Smith stated he believes he is being targeted by the Black inmate population. I asked inmate Smith if he has safety concerns and Smith stated, "I keep on getting assaulted, so yes I do." . . . On November 8, 2013, inmate Smith was involved in a fight with his cellmate, Inmate Johnson. . . . Smith was moved to . . . cell 125 with inmate Law. On November 11, 2013, inmate Smith was admitted into the Crisis Unit because he stated he was hearing voices to kill his cellmate. . . . it is apparent inmate Smith has safety concerns among the Black inmate population based on his statement.

(Id. at 8 (Exhibit B)).

///

///

22

### 2.   *Defendant's Action Did Not Chill Plaintiff's Exercise of His Right to File Grievances Against Prison Officials*

Defendants argue that Defendant's action did not chill Plaintiff's exercise of First Amendment rights because since the time of Gonzales's alleged retaliation, Plaintiff has filed over one hundred inmate grievances, including twenty against prison staff.  S. Boxall, Appeals Coordinator at California State Prison-Sacramento (CSP-SAC) declares:

> "At the request of the Attorney General's Office, a search of the computer system was conducted under the name of Larry Smith, CDCR No. K-91850, for all non-health care related grievances received by the CSP-SAC Grievance Office. . . . There are thirty-three grievances listed in the Appeals History Report (Exhibit A).  All of the grievances listed were received by the CSP-SAC Grievance Office after September 24, 2013.  As shown under the column 'Issue' in the Appeals History Report, ten of the grievances were grievances against prison staff."

(Boxall Decl., ECF No. 87-5 at 2 ¶¶ 5, 6, and Exh. A.)

### 3.   *Defendant's Action Advanced Legitimate Correctional Goals*

Defendants argue that under the disputed facts the actions taken against Plaintiff, which he alleges were retaliatory, did advance legitimate correctional goals as shown by the Undisputed Facts.  As shown on the Form 128(b) prepared by defendant Gonzales, the safety and security concerns are clear.  (ECF No. 87-4, Exh. A.)  James Mathison, defense counsel, submits copies of the CDCR Form 114D Administrative Segregation Placement Notice, which states:

> On November 13, 2013, you, inmate Smith (K-91850), are being removed from the Facility III-A general population and re-housed in Administrative Segregation Unit (Ad-Seg) due to self-expressed safety concerns.  Specifically, on this date, you informed Correctional Staff that you have safety concerns and your life would be in jeopardy should you remain on Facility 3A. and you are requesting SNY placement.  Based on this, your presence on the facility presents a threat to your safety, the safety of others, and jeopardizes institutional security.

///

Therefore, you will be placed in Ad-Seg pending an Administrative Review.

(Mathison Decl., ECF No. 87-9 at 4 (Exh. A).

**B.      There Was No Unconstitutional Excessive Use Of Force Or Failure To Protect**

Under Defendants' Undisputed Facts  ##3, 4, 7, 10, and 11, Defendants declare that they did not use any physical force on Plaintiff, other than defendant Johnson handcuffing Smith after he refused to comply with instructions for an unclothed body search.

Defendant B. Johnson declares:

"I did not use physical force on Smith at any time during the events described in the previous paragraph,[7] other than to handcuff him at his cell without incident.  I did not see anyone use physical force on Smith at any time during these events."

(Johnson Decl. ECF No. 87-10 ¶ 3.)

Defendant Scaife declares:

"On September 24, 2013, I was working as a Floor Officer in Facility 3A of CSPCOR.  At approximately 7:15 a.m., Officer B. Johnson and I went to the housing cell of Plaintiff inmate Larry Smith (CDCR #K-91850) to conduct a search for contraband.  As part of this search, Officer Johnson attempted to conduct an unclothed body search of Smith.  When Officer Johnson instructed Smith to bend at the waist to permit a visual inspection of his rectum, Smith refused to comply.  Because of this, Officer Johnson handcuffed Smith and escorted him to the Program Office, and I remained at the cell.  I did not use any physical force on Smith during these events.  I did not see Officer Johnson use physical force on Smith, other than handcuffing Smith without incident.  In his Complaint in this lawsuit, Smith alleges that he was assaulted by other Defendants

---

[7] In the previous paragraph of defendant Johnson's declaration, Johnson describes his attempt to conduct an unclothed body search of Plaintiff while at Plaintiff's cell on September 24, 2013. (Johnson Decl. ECF No. 87-10 at 1 ¶ 2.)

at the Program Office shortly after he was escorted there by Officer Johnson.  I was not present during these alleged events."

(Scaife Decl., ECF No 87-14 ¶¶ 2, 3.)

Defendant Sgt. Gonzales declares:

"On September 24, 2013, I worked in Facility 3A of CSP-COR.  At approximately 7:45 a.m., I was informed by Correctional Officer Johnson that Plaintiff inmate Larry Smith (CDCR #K-91850) had refused to comply with Johnson's orders to submit to an unclothed body search for contraband, and that Smith had been placed in a holding cell adjacent to the Program Office.  I entered the holding cell area and spoke with Smith about the situation, and of the need to complete the search to ensure that he was not in possession of contraband.  I instructed Smith to remove his boxer shorts, and I conducted a visual search of his mouth, ears, hands, fingers, underarms, and feet.  I instructed Smith to step out of the holding cell in order to visually inspect his rectal cavity, and to bend forward at the waist and spread his buttocks, in order to conduct the inspection. Smith refused to comply with this instruction, and instead he squatted and coughed.  After about five minutes of speaking with Smith about his failure to comply with my instructions, he complied and the search was concluded. Following the search, Smith dressed and I instructed him to return to his assigned cell.  Smith exited the Program Office and stated that he wanted to see the nurse because his back hurt.  I again instructed Smith to return to his cell, and told him that my staff would notify medical staff of his request.  Smith went into a seated position and lay down in front of the Program Office door.  I again instructed Smith to return to his cell.  Smith ignored my instruction and remained in his position.  A Licensed Vocational Nurse arrived at the location and conducted a Form 7219 evaluation of Smith, and he was medically cleared to return to his cell. I instructed my staff to retrieve a wheelchair, and I and other officers escorted Smith back to his cell.  I did not use physical force on Smith at any time during

these events.  I did not see anyone use physical force on Smith at any time during

these events."

(Gonzales Decl., ECF No 87-4 ¶ 2 and Exh. A (Rules Violation Report describing these same

events.))

Defendant Potzernitz declares:

"On September 24, 2013, I was working in the Facility 3A Program Office

of CSP-COR.  At approximately 7:45 a.m., Sergeant Gonzales instructed me to

assist in escorting Plaintiff inmate Larry Smith to his cell.  I did so, moving Smith

from his location outside of the Program Office building to his cell.

I did not use physical force on Smith at any time during the events

described in the previous paragraph.  I did not see anyone else use physical force

on Smith at any time during these events."

(Potzernitz Decl., ECF No. 87-12 ¶¶ 2, 3.)

Defendants Johnson, Castro, Flores and Meier declare that they were in the Program

Office building at the time defendant Gonzales searched Plaintiff, none of these Defendants were

involved in the events and they did not use any physical force on Plaintiff.  (Decl. Johnson, ¶ 2;

Decl. Castro, ¶ 2, 3; Decl. Meier, ¶ 2; Decl. Flores, ¶ 2.)  Defendant Scaife declares that she was

not present at the Program Office during the time that Plaintiff alleges that he was assaulted by

other Defendants after he was escorted there by defendant Johnson.  (Decl. Scaife, ¶ 3.)

## VII.   DEFENDANTS HAVE MET THEIR BURDEN

Based on Defendants' arguments and evidence the court finds that Defendants have met

their initial burden.  Therefore, the burden now shifts to Plaintiff to produce evidence of a genuine

material fact in dispute that would affect the final determination in this case.

///

///

## VIII.   ANALYSIS

Plaintiff's evidence includes Plaintiff's allegations in the verified First Amended

Complaint (ECF No. 12), Plaintiff's verified opposition to motion for summary judgment (ECF

No. 90), Plaintiff's verified second opposition to motion for summary judgment (ECF No. 93), and prison records.

### A.   Retaliation

On October 31, 2019, the court found that Plaintiff stated a cognizable claim in the First Amended Complaint that Sergeant Gonzales retaliated against Plaintiff for writing Form 602 grievances against Sergeant Gonzales, when Gonzales wrote a fictitious lock-up order against Plaintiff and had Plaintiff placed in Administrative Segregation, during which time Plaintiff's personal property was taken from him.  (ECF No. 16 at 20- 22 ¶ F.)

Plaintiff alleges in the verified First Amended Complaint that defendant Sergeant Gonzales told Plaintiff's clinician, Dr. Stokes, that he was placing Plaintiff in Ad-Seg for safety concerns because Plaintiff had told him (Gonzales) that Plaintiff was being beaten up by the Black inmates for no reason (ECF No. 12 at 16:24-27); that  Sgt. Gonzales issued Plaintiff a fictitious lock-up order for safety concerns and had him placed in Ad-Seg. Plaintiff further alleges that he never told Sgt. Gonzales he was being beaten up and that Sgt. Gonzales made up a fictitious story to suit his purpose for the lock up order and RVR (Id. at 14:27-15:2.)  Plaintiff contends that Sgt. Gonzales issued the safety concerns order to get back at Plaintiff for filing the 602 use of force appeal. (Id. at 16:15-18.)  Sgt. Gonzales labeled him as a "snitch" and pressured Plaintiff into being placed on a sensitive needs yard, both which placed Plaintiff in danger when released back to the yard or transferred to another prison.  (Id. at 16:19-17:4.)

### Protected Conduct

First, Plaintiff alleges in the First Amended Complaint that he wrote and filed form 602 grievances regarding conduct against him by Sergeant Gonzales.  Plaintiff has satisfied the first requirement to state a retaliation claim by alleging that he participated in the prison appeals process, which is protected conduct.

///

### Adverse Action

Second, Plaintiff claims that defendant Sergeant Gonzales took adverse actions against him when Defendant issued a lock-up order against Plaintiff falsely claiming that Plaintiff had

told him (Gonzales) that Plaintiff was being beaten up by Black inmates for no reason, which resulted in Plaintiff being removed from Facility III-A General Population and placed into Administrative Segregation.  Plaintiff also alleges that Sgt. Gonzales labeled him a "snitch," pressured him into being placed on a sensitive needs yard, and confiscated his personal property. Plaintiff has sufficiently described adverse actions allegedly taken against him by Sergeant Gonzales, therefore satisfying the second requirement of a retaliation claim.

### Nexus Between Protected Conduct and Adverse Action

Third, Plaintiff must allege a causal connection between the adverse action(s) and the protected conduct.  Plaintiff alleges in the First Amended Complaint that Sgt. Gonzales instructed C/O Johnson to roll up Plaintiff's property and bring it up to the program office because if Plaintiff was going to file a 602 grievance for staff misconduct and use of force, then Sgt. Gonzales would have Plaintiff placed in Administrative Segregation for three to six months without his property.  This suggests a causal connection between Plaintiff's 602 grievances and Sgt. Gonzales placing Plaintiff in Administrative Segregation.  Plaintiff also alleges that he overheard C/O Johnson and Sgt. Gonzales conspiring in the hallway where C/O Johnson said, "Inmate Smith has a history of filing staff misconduct complaints" (ECF No. 12 at 7:4-5.), whereupon Sgt. Gonzales responded, "Let him go back to his cell and if he says anything we'll say he got into a fight with his cell mate." (ECF No. 12 at 7:6-7.)  This suggests a causal connection between Plaintiff's filing of staff misconduct complaints and Gonzales's threat to cover up the excessive force incident against Plaintiff.

Sgt. Gonzales's statements to C/O Johnson are admissions of a party opponent and do not constitute inadmissible hearsay.[8]  Accordingly, Plaintiff has alleged admissible facts that suggest a nexus between his First Amendment activities and the adverse actions by defendant Sgt. Gonzales, which satisfies the third requirement for stating a retaliation claim.

### Chilling Effect of Future First Amendment Activities

---

[8] The statement of a party opponent is not hearsay.  See Fed. R. Evid. 801(d)(2)(D). Holzhauer v. Golden Gate Bridge Highway & Transportation Dist., 745 F. App'x 265, 268 (9th Cir. 2018)

Fourth, the plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." Rhodes, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm," Brodheim, 584 F.3d at 1269, that is "more than minimal," Rhodes, 408 F.3d at 568 n.11.

Defendants argue that any retaliatory conduct by Sergeant Gonzales did not chill Plaintiff from filing additional 602 complaints because computer records show that after September 24, 2013, the CSP-SAC Grievance Office received thirty-three non-health care grievances from Plaintiff, with ten of them against prison staff.  (Boxall Decl., ECF No. 87-5 at 2 ¶¶ 5, 6, and Exh. A.)  However, Defendants' evidence is not conclusive.[9]  Focusing on whether or not the record showed that Plaintiff was *actually* chilled would be incorrect.  In Rhodes, the Ninth Circuit "explicitly held that an objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities." Brodheim, 584 F.3d at 1271 (9th Cir. 2009) (citing Rhodes, 408 F.3d at 568–69, quoting Mendocino Enviro. Center v. Mendocino Cty., 192 F.3d 1283, 1300 (9th Cir. 1999) (emphasis in original)).  "To hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity.'"  Brodheim , 584 F.3d at 1271 (quoting Rhodes at 569).  "[T]he comment in Rhodes at footnote 11[10] suggests that adverse action which is more

---

[9] The prisoner need not demonstrate a *total* chilling of his First Amendment rights in order to establish a retaliation claim.  See Rhodes v. Robinson, 408 F.3d 559 at 568-69 (9th Cir. 2005) (rejecting the argument that an inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit).

[10] Footnote 11:  "If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. Alleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety. See, e.g., Pratt, 65 F.3d at 807 (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing whether the harm had a chilling effect); Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir.1989) (same)."  Rhodes, 408 F.3d 559, 568 f.n.11 (9th Cir. 2005)

than minimal satisfies this element[, and t]hus, if this reading of <u>Rhodes</u> is correct, the chilling effect element is essentially subsumed by adverse action." <u>Chatman v. Medina</u>, No. 2:11-cv-0681-MCE-CMK-P, 2014 WL 1155565 at *15 (E.D. Cal. Mar. 21, 2014.)

Here, Plaintiff alleges that Sergeant Gonzales issued a lock-up order against Plaintiff falsely claiming that Plaintiff had told him (Gonzales) that Plaintiff was being beaten up by Black inmates for no reason, which resulted in Plaintiff being removed from Facility III-A General Population and placed into Administrative Segregation. Plaintiff also alleges that Sgt. Gonzales labeled him a "snitch" and pressured him into being placed on a sensitive needs yard.

The court finds that Plaintiff's allegations related to the non-minimal adverse actions he suffered are sufficient to also demonstrate the required chilling effect. <u>Id.</u>. Therefore, Plaintiff has satisfied the fourth requirement for stating a claim for retaliation.

**<u>Action Did Not Advance Legitimate Penological Goals</u>**

Fifth, the plaintiff must allege "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution. . . ." <u>Rizzo v. Dawson</u>, 778 F.2d 527, 532 (9th Cir.1985).

Defendants have shown that the Form 128(b) prepared by defendant Gonzales expresses his safety and security concerns (ECF No. 87-4, Exh. A), and the CDCR Form 114D Administrative Segregation Placement Notice states that Plaintiff is being removed from the general population and re-housed in Ad-Seg due to Plaintiff expressing that he has "safety concerns and his life would be in jeopardy should [he] remain on Facility 3A." (Mathison Decl., ECF No. 87-9 at 4 (Exh. A). Keeping inmates safe and secure is undoubtedly a legitimate penological goal.

However, Plaintiff's evidence shows that some of Sgt. Gonzales's retaliatory actions did not advance legitimate penological goals. (ECF No. 12 at 19:3-5.) Defendant Sgt. Gonzales's alleged threats -- to have Plaintiff placed in Administrative Segregation for three to six months without his property, and to cover up evidence that excessive force was used against Plaintiff – do not advance any legitimate penological goals, as "the mere *threat* of harm can be an adverse action. . . ." <u>Brodheim</u>, 584 F.3d at 1270. If true, Defendants have not shown how either labelling

Plaintiff a "snitch" and pressuring him into being placed on a sensitive needs yard, where he would be at further risk of harm by other inmates, or confiscating Plaintiff's personal property and never returning it, would advance a legitimate penological goal.

The court finds therefore that Plaintiff's evidence is sufficient to create a genuine issue of fact as to whether Defendant took adverse actions against Plaintiff because Plaintiff filed prison grievances. Accordingly, the court shall recommend that Defendant Gonzales be denied summary judgment on Plaintiff's retaliation claim.

### B. Excessive Force And Failure To Protect

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . .whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6–7 (citing Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). In making this determination, the Court may evaluate (1) the extent of any injury suffered by Plaintiff; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible prison officials; and (5) any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321).

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force causes should be granted sparingly." Avina v. U.S., 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted).

There are two incidents of excessive force alleged by Plaintiff in this case. One allegedly took place on September 24, 2013 at approximately 7:15 a.m., after defendant C/O Johnson attempted to conduct an unclothed body search on Plaintiff at Plaintiff's cell. Plaintiff alleges that after C/O Johnson failed to conduct the body search, he grabbed Plaintiff by the arm and the back of his head and slammed his face into the wall, busting Plaintiff's mouth, and then handcuffed him. (ECF No. 12 at 5 ¶ 3.) Plaintiff also alleges that C/O Johnson grabbed him by

the hand, still handcuffed, bent his wrist very aggressively, escorted Plaintiff to the Program Office, and placed him into a holding cage.  (Id.)

The second incident allegedly took place later the same day, on September 24, 2013 at approximately 7:45 a.m. at the Program Office.  Plaintiff alleges that defendant Sgt. Gonzales unlocked the holding cage and instructed him to exit, then ordered Plaintiff to bend forward at the waist and grab his buttocks and spread them open so Sgt. Gonzales could check for contraband. (ECF No. 12 at 6:12-15.)  Plaintiff refused to cooperate, and defendant Sgt. Gonzales grabbed Plaintiff and instructed the other officers to take Plaintiff down. (Id. at 6:19-21.)  Plaintiff alleges that defendants Johnson, Castro, Meier, Flores, and Potzernitz all attacked Plaintiff, forcing him to the ground naked while defendant C/O Scaife stood by and watched the assault. (Id. at 6:21:5, 21-28.)  Plaintiff alleges that he was kicked and stomped in the head, shoulders, back, and legs, causing abrasions and bruises. (Id.)  C/O Meier and C/O Flores grabbed Plaintiff's ankles and forced his legs apart, so that defendant Sgt. Gonzales was able to complete the body search.  (Id.)

Here, Defendants' account of the alleged use of force in their undisputed facts is entirely different from Plaintiff's.  Each of the Defendants filed a declaration signed under penalty of perjury declaring that they did not use *any* physical force at *any* time during the events against Plaintiff, except to apply handcuffs.  (ECF No. 87-4 at 2:16-17;. ECF 87-10 at 2 ¶ 3; ECF No. 87-11 at 2 ¶ 3;  ECF No. 87-12 at 2 ¶ 3; ECF No. 87-13 at 1 ¶ 2; 87-14 at 2 ¶ 2; ECF No. 87-15 at 2 ¶ 3.)  Defendants conclude that defendant Scaife is not liable for failing to protect Plaintiff from defendant Johnson's use of force because defendant Johnson did not use force.  (ECF No. 87-2 at 8:24-25.)  In the alternative, Defendants contend that accepting Plaintiff's allegations as true, there is no Eighth Amendment violation because Defendants used minimal force in response to Plaintiff's misbehavior.  (Id. at 8:26-9:7.)  Defendants also argue that taking the facts in the light most favorable to Plaintiff, they are entitled to qualified immunity.  (ECF No. 87-2 at 12-10.)

Whether Defendants used no force, minimal force, or excessive force, and whether defendant Scaife failed to protect Plaintiff from excessive force are questions for the jury at trial.

These factual disputes, all of which require a trier of fact to make credibility determinations, preclude a dispositive finding at summary judgment on Plaintiff's excessive force and failure to protect claims.   These multiple genuine disputes of material fact preclude this court's ruling as a matter of law, including on qualified immunity grounds, in Defendants' favor.

Accordingly, the court shall recommend that summary judgment be denied as to Plaintiff's excessive force and failure to protect claims.

## IX.      CONCLUSION AND RECOMMENDATIONS

Drawing all inferences in the light most favorable to Plaintiff, the court finds that Plaintiff has submitted sufficient admissible evidence demonstrating the existence of a triable issue of fact regarding whether defendant Sgt. Gonzales retaliated against him for filing Form 602 grievances against Sgt. Gonzales-- thus genuine issues of material fact preclude entry of summary judgment. Therefore, the court shall recommend that summary judgment be denied on Plaintiff's claim for retaliation against defendant Gonzales.

With respect to Plaintiff's claims for excessive force and failure to protect Plaintiff in violation of the Eighth Amendment, the court has also determined that genuine issues of material fact preclude entry of judgment.

Based on the foregoing, the court shall recommend that Defendants' motion for summary judgment, filed on December 21, 2020, be denied.

Accordingly, it is **HEREBY RECOMMENDED** that:

1.      The motion for summary judgment filed by defendants Sgt. Gonzales, C/O Johnson, C/O Castro, C/O Meier, C/O Flores, C/O Potzernitz, and C/O Scaife on December 21, 2020, be DENIED;

2.      This case now proceed against defendants Sergeant Gonzales, Correctional Officer (C/O) Johnson, C/O Castro, C/O Meier, C/O Flores, and C/O Potzernitz for use of excessive force in violation of the Eighth Amendment; against defendant Sergeant Gonzales for retaliation against Plaintiff in violation of the

///

First Amendment; and against defendant C/O Scaife for failure to protect Plaintiff

in violation of the Eighth Amendment; and

3.     This case be referred back to the Magistrate Judge for further proceedings.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within fourteen days** from the date of service of these Findings and Recommendations, any party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed **within ten days** of the date the objections are filed.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **June 16, 2021**           **/s/ Gary S. Austin**
                                       UNITED STATES MAGISTRATE JUDGE